# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| DONNA GODWIN, Individually and as Executrix of the Estate of Denise Morataya, Deceased, | ) ) ) ) | CASE NO. 5:17-cv-1133 |
| PLAINTIFF, | ) ) ) | JUDGE SARA LIOI |
| vs. | ) ) ) | MEMORANDUM OPINION AND |
| METRO RTA, et al., | ) ) ) ) | ORDER OF REMAND |
| DEFENDANTS. | ) ) | |

This is a civil action for disability discrimination and negligence arising out of an accident in Akron, Ohio, involving a disabled passenger on a bus owned by defendant Metro Regional Transit Authority ("Metro RTA"). On May 7, 2015, Denise Morataya ("Morataya") was disembarking a handicap-accessible bus operated by defendant Corey Jones ("Jones") when she stepped into the breach between the bus' ramp and the floor and suffered serious injuries. Morataya passed away on March 1, 2020. (*See* Doc. No. 106 (Notice of Suggestion of Death ["Notice"]).) The amended complaint alleges violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, § 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794(a), and state law. (Doc. No. 27 ["Am. Compl."].)

Metro RTA has moved for summary judgment on plaintiff's ADA and Rehabilitation Act claims, and Jones seeks summary dismissal of plaintiff's state law claims on the ground of immunity. (Doc. No. 94 ["MSJ"].) Plaintiff opposes the motion (Doc. No. 99 ["MSJ Opp'n"]),

and Metro RTA and Jones have filed a reply (Doc. No. 102 ["MSJ Reply"]). For the reasons that follow, summary judgment is granted in part. Plaintiff's ADA and Rehabilitation Act claims are dismissed, and the state law claims are remanded to state court.

## I.   BACKGROUND

At the time of the accident, Morataya was a 56-year-old woman who suffered from diabetes which had caused peripheral neuropathy in her legs and feet, gastroparesis and retinopathy and cataracts in both eyes. (Doc. No. 97-1 (Deposition of Denise Morataya ["Morataya Dep."]) at 7, 35, 51, 52, 53, 54, 78.)[1] For purposes of the present motion, the parties do not dispute that Morataya's medical conditions, separately or in combination, constituted "disabilities" as defined by the ADA and the Rehabilitation Act.

Metro RTA is a regional transit authority created pursuant to Ohio Rev. Code Chapter 306 and is located in Akron, Ohio. It provides public transportation service throughout and beyond Summit County through regular fixed route service, as well as on-demand response services for persons over the age of 62 and those with disabilities. (Doc. No. 95-1 (Deposition of David Sanzone ["Sanzone Dep."]) at 9, 13, 14.) Sanzone, a trainer with Metro RTA, testified that Metro RTA relies on large traditional buses to service its fixed routes and utilizes smaller vehicles—SCATs and M4s—to provide on-demand transportation. (*Id*. at 9–10; *see* Doc. No. 98-1 (Deposition of Corey Jones ["Jones Dep."]) at 16.) The SCAT is comparable to a small van, approximately 28 feet in length, that is equipped with a lift on the side of the vehicle that can be lowered to assist those with mobility issues to embark and disembark the vehicle.[2] (Sanzone

---

[1] All deposition page numbers refer to the page number assigned to the transcript by the court reporter. All other record citations refer to the page identification number generated by the Court's electronic docketing system.

[2] The M4 is a smaller vehicle used for maneuvering in small driveways. (Sanzone Dep. at 10; Jones Dep. at 17.)

Dep. at 10–11; *see* Jones Dep. at 16–17.) As a result of her disabilities, Morataya had been approved in 2014 by Metro RTA to ride the SCAT and had successfully utilized such transportation on numerous occasions prior to the accident. (Morataya Dep. at 78–84.)

Jones had been employed by Metro RTA as an operator since August 2012. (Jones Dep. at 9.) Following his hire, and prior to Morataya's accident, Jones received training in the operation of Metro RTA vehicles (including the SCAT) and the lifts, as well as the requirements of the ADA as they relate to disabled passengers. (Sanzone Dep. at 34, 56–61; Jones Dep. at 26, 38.) Metro RTA operators, including Jones, are also required to shadow other drivers before they are permitted to operate Metro RTA vehicles on their own. (Jones Dep. at 38.)

On May 7, 2015, Jones was assigned to drive a SCAT, and his vehicle was equipped with a Braun Series 600 lift which must be lowered and raised by the operator. (Sanzone Dep. at 11, 23–25.) When not in use, the lift folds into an upright position and is stored on the vehicle. (Sanzone Dep. at 23.) When the operator must deploy the lift, he deboards the vehicle to open the outside doors where the ramp is stored. (Sanzone Dep. at 24; Jones Dep. at 31.) He then utilizes a hand control that first allows the lift to "unfold" and raise or lower to a stable point so that the passenger may board or deboard the vehicle. (Sanzone Dep. at 23–25.) A warning buzzer signals the passenger when the lift is in motion. (Sanzone Dep. at 11, 21–22; Jones Dep. at 43, 111, 140.)

The parties agree that the Braun lift had what plaintiff's expert referred to a "common characteristic" that sometimes prevented the lift from fully unfolding to 90º, resulting from the fact that the lift is "jostled around during transport[.]" (Doc. No. 98-7 (Deposition of John Cleveland ["Cleveland Dep."]) at 37–38.) Jones characterized this as a "glitch." (Jones Dep. at

3

104.) When the "glitch" occurs, it is necessary to hit the unfold button again to ensure that the lift is fully unfolded. (Cleveland Dep. at 37–38; Jones Dep. at 104, 108; Sanzone Dep. at 45, 49.) This technique has been incorporated into the training that Metro RTA operators receive on operating the SCAT lifts. (Sanzone Dep. at 49–50.)

Upon arriving for his shift on May 7, 2015, Jones located his SCAT and performed the necessary vehicle inspection to ensure that the equipment, such as the lights and the lift, were operating properly, which he found them to be. (S*ee* Jones Dep. at 24.) Inside the vehicle was a tablet that contained the itinerary for the day. (Jones Dep. at 74; *see id*. at 24.) Morataya was scheduled to be transported that morning from her house to a facility close by where she had a medical appointment. (*See* Jones Dep at 76.) Jones pulled his vehicle into Morataya's driveway as Morataya, assisted by an unknown male, exited her home. (Jones Dep. at 76–78, 79, 83–84, 86.) While Morataya was not utilizing a mobility device, Jones could see that she was not steady on her feet, that she was at a high risk of falling, and that she would require the use of the lift to board the SCAT. (Jones Dep. at 84–85.) The man assisting Morataya eventually let go of her arm, and Morataya walked the remaining 10 to 15 feet to the SCAT unassisted at which point Jones exited the SCAT and began lowering the lift. (Jones Dep. at 84.)[3] Morataya boarded the SCAT without incident and took her seat. (Jones Dep. at 87–88, 89.)

The trip to the medical facility took fewer than five minutes, and Jones pulled the SCAT up to the building entrance to park, lowered the ramp, and allow Morataya to deboard.

---

[3] Given her unsteadiness, Jones found it odd that the man assisting Morataya did not walk her all the way to the SCAT. (Jones Dep. at 84–85; *see also id*. at 86.)

(Jones Dep. at 91.) The building entrance had a pedestrian bridge in front of it that the SCAT would not fit under, so Jones looked for a place on the street to park. (Jones Dep. at 91–92, 93, 95.) It was a "very busy day for traffic," but Jones eventually located a side street adjacent to the building entrance where he could park his vehicle. (Jones Dep. at 92–93, 95.)

Jones exited his vehicle and began deploying the ramp so that Morataya could deboard. Jones testified that there was considerable traffic all around the SCAT and he was constantly looking for cars and other obstructions. (Jones Dep. at 97, 99, 100, 101.) Jones testified that he may have greeted a woman who was walking on a nearby sidewalk, and he admits that he was distracted by the surrounding traffic. (Jones Dep. at 91–96, 114.) While Jones was testing[4] the lift by lowering it to make sure that it fully unfolded to a horizontal position, Morataya, who was outside of Jones' view, stepped onto the ramp.[5] (Jones Dep. at 113, 115–16.) What followed happened quickly, and the results were tragic. (Jones Dep. at 116.) Jones tried to yell "no" to Morataya as she stepped into the gap between the ramp and vehicle and fell. (Jones Dep. at 116.) There is no dispute that Jones did not instruct Morataya to wait until the ramp was fully unfolded before alighting it, and he did not otherwise inform Morataya of the process for deboarding the SCAT.[6] (*See* Jones Dep. at 110, 111.)

As a result of the fall, Morataya sustained a fractured left shoulder and a compression fracture of the T-12 vertebrae. (Morataya Dep. at 105.) For purposes of the present motion, it has

---

[4] Jones testified that it was his practice to "test" the lift by hitting the lower button to ensure that it will unfold completely. (Jones Dep. at 109.) If the glitch occurred, he would angle the lift back up and hit the lower button again. (*Id*. at 106–07, 110.)

[5] The "glitch" that sometimes occurs with the Braun lift, where the lift does not fully deploy, did not occur in this instance. (Jones Dep. at 104; *see* Cleveland Dep. at 21 ["There was no defect in the lift."].)

[6] Jones testified that he assumed that passengers know that they should wait until after the buzzing noise the lift makes as it is unfolding stops before they step onto the ramp. (Jones Dep. at 43, 111.)

been represented that the compression fracture progressed to a burst fracture resulting in a catastrophic spinal cord injury which left Morataya paralyzed and incontinent, and substantially aggravated her pre-existing gastroparesis. (MSJ Opp'n at 1883.) From May 2019 through February 2020, Morataya was a patient at a long-term acute care facility. On or about February 20, 2020, she made the decision to forego further treatment and receive only comfort care. She died ten days later, and, upon the filing of the suggestion of her death, Morataya's executrix, Donna Godwin (hereinafter, "plaintiff"), was replaced as the party plaintiff. (*Id*.; *see* Notice.)

On May 5, 2017, Morataya filed suit in state court against Metro RTA and Jones. (Doc. No. 1-1 (Complaint).) On May 31, 2017, Metro RTA and Jones removed the action to federal court on the basis of federal question jurisdiction under 28 U.S.C. § 1331. (Doc. No. 1 (Notice of Removal), citing the ADA and Rehabilitation Act claims as the basis for removal.) On November 22, 2017, Morataya filed an amended complaint that added additional state law claims and defendants related to the medical care she received following the accident. As amended, the complaint raises claims for disability discrimination under and/or deprivation of benefits guaranteed by the ADA and the Rehabilitation Act, negligence, and loss of consortium.[7] Currently, trial is set in this matter for September 14, 2020. (*See generally* Am. Compl.; Doc. No. 103 (Fourth Amended Case Management Plan and Trial Order) at 2353.)[8]

On June 14, 2020, after summary judgment was fully briefed, plaintiff moved for an extension of the expert discovery deadlines and trial date, and also moved for leave to file a

---

[7] In addition to Metro RTA and Jones, the amended complaint asserted claims against HCR Manorcare, Inc., Manorcare Health Services, LLC, Manorcare of Akron Ohio, LLC, Manorcare Health Services, UH Internal Medicine Specialists, and Joseph Iemma (collectively, "medical defendants"). The medical defendants, against whom only state law claims are asserted, have not sought summary judgment.

[8] Unfortunately, there have been numerous delays in the case caused primarily by Morataya's health concerns and her inability to effectively participate in discovery prior to her death.

6

second amended complaint. (Doc. No. 107 ["Mot."].) With respect to the latter, plaintiff seeks leave to bring a wrongful death action, and defendants collectively insist that Ohio law does not support such an amendment. The Court held a hearing on the motion, and the parties have filed numerous pre and post-hearing briefs regarding the issues raised therein. (*See* Doc. Nos. 108–117.) The motion is under advisement, and the parties agreed at the hearing that the issues raised in the motion to continue/amend have no bearing on the present summary judgment motion.

## II. STANDARD OF REVIEW

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the

applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id*. at 252.

"Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v. Clorox Co*., 926 F.2d 559, 561 (6th Cir. 1991). The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. *Banks v. Wolfe Cty. Bd. of Educ*., 330 F.3d 888, 892 (6th Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial). Moreover, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; a mere "scintilla of evidence" is insufficient. *Bell v. Ohio State Univ*., 351 F.3d 240, 247 (6th Cir. 2003) (quotation marks and citation omitted). Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(3); s*ee also Street v. J.C. Bradford & Co*., 886 F.2d 1472, 1479–80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.") (citing *Frito-*

*Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

### III. LAW AND DISCUSSION

In Count II of the amended complaint, plaintiff alleges that Metro RTA violated the ADA by failing to train its operators to "proficiency," and by failing to maintain and remove from service and/or repair inoperable equipment. In Count III, plaintiff alleges, pursuant to the Rehabilitation Act, that Metro RTA excluded Morataya from participation in, and denied her the benefits of, the services provided by Metro RTA. Title II of the ADA provides:

> … [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. To prove that a public program or service provider violated Title II of the ADA, a plaintiff must show: (1) she is a "qualified individual with a disability"; (2) she was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of her disability. *See Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015) (citation omitted). A plaintiff bringing suit under § 504 of the Rehabilitation Act must show that: (1) she is an individual with a disability; (2) she is otherwise qualified to receive benefits; (3) she was denied the benefits of the program solely by reason of her disability; and (4) the program receives federal financial assistance. *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001); *see Center v. City of W. Carrollton*, 227 F. Supp. 2d 863, 867 (S.D. Ohio 2002). Given the similarity in the purpose, scope, and governing standards, courts treat cases construing Title II and § 504 interchangeably. *See Mote v. City of Chelsea*, 284 F. Supp. 3d 863, 876 (E.D. Mich. 2018) (recognizing that Title

9

II of the ADA was modeled after § 504 of the Rehabilitation Act, courts have "observed that [t]here is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act[]") (quotation marks and citations omitted).

As an obligation under the ADA, a public entity that operates a fixed-route transit system must provide "paratransit and other special transportation services to individuals with disabilities … that are sufficient to provide to such individuals a level of service" that is "comparable to … public transportation services provided to individuals without disabilities[.]" 42 U.S.C. § 12143. An eligible recipient of paratransit services includes "any individual with a disability who is unable, as a result of a physical or mental impairment … to board, ride, or disembark from any vehicle on the [fixed-route] system," or "any individual with a disability who has a specific impairment-related condition which prevents such individual from traveling to a boarding location or from a disembarking location on such system[.]" 42 U.S.C. §§ 12143(c)(1)(A) (i), (iii). There is no disagreement that Morataya was an eligible recipient of paratransit services.

### A.  Failure to Train

#### 1.  ADA Training Requirements

With respect to Metro RTA's training of its employees, the relevant ADA regulation, 49 C.F.R. § 37.173, states:

> Each public or private entity which operates a fixed route or demand responsive system shall ensure that personnel are trained to proficiency, as appropriate to their duties, so that they operate vehicles and equipment safely and properly assist and treat individuals with disabilities who use the service in a respectful and courteous way, with appropriate attention to the difference among individuals with disabilities.

49 C.F.R. § 37.173.

Appendix D was created by the United States Department of Transportation ("DOT") to

explain the construction and interpretation of the provisions found in 49 C.F.R. Part 37, and it elaborates on what it means to "train to proficiency."[9] DOT instructs that every employee who is involved with service to persons with disabilities "must have been trained so that he or she knows what needs to be done to provide the service in the right way." 49 C.F.R. Part 37, App. D. The Appendix also clarifies that "[w]hile there is no specific requirement for recurrent or refresher training, there is an obligation to ensure that, at any given time, employees are trained to proficiency." *Id.* "An employee who has forgotten what he was told in past training sessions, so that he or she does not know what needs to be done to serve individuals with disabilities, does not meet the standard of being trained to proficiency." *Id.* Particularly relevant to the issues at hand, the guidance provides that "training must be appropriate to the duties of each employee … [a] bus driver must know how to operate lifts and securement devices properly." *Id.* Further, the guidance notes that "the training requirement goes to both technical tasks and human relations[,]" and underscores the need for "every public contact employee … to understand the necessity of treating individuals with disabilities courteously and respectfully, and the details of what that involves." *Id.*

The ADA does not "require organizations to effect the *best* training methods, rather only sufficient training protocols to ensure that drivers are 'trained so that he or she knows what needs to be done to provide the service in the right way.'" *Wilson v. Broward Cty.*, No. 04-61068-CIV, 2007 WL 2900389, at *9 (S.D. Fla. Sept. 28, 2007) (quoting 49 C.F.R. Part 37, App. D) (emphasis in original). Notably, neither § 37.173, nor its corresponding guidance, requires the

---

[9] DOT recognizes that the regulations apply to different types of organizations with varying resources: "we believe that training should be conducted in an efficient and effective manner, with appropriate flexibility allowed to the organization that must carry it out." *Id.*

operator to be trained to discuss with a disabled passenger the boarding and deboarding process, nor do they dictate the nature or type of communication an operator must engage in with a disabled passenger.[10]

### 2.    Metro RTA's Training Program

Metro RTA follows a written protocol with respect to operator training, and the training is conducted in person, with both classroom instruction and opportunities for interactive engagement. Though not required by the ADA, operators also receive refresher training—which includes the ADA requirements for paratransit passengers—at regular intervals. (Sanzone Dep. at 33, 37, 41–42.) With respect to training about ADA requirements, Metro RTA's protocol covers, among other things, wheelchair securement, use of ramps and service animals, as well as how to interact with, assist, and treat passengers with disabilities. (Sanzone Dep. at 17–18, 20; Jones Dep. at 65–66; Jones Dep., Ex. 5.)

In learning how to operate the lifts, operators receive hands-on training, and individual operators whom Metro RTA is aware have had difficulties with the lift receive additional training. (Sanzone Dep. at 20, 43–44; Jones Dep. at 38, 40, 50, 52.) As to parking their vehicle to facilitate a stop, operators are instructed to always try to find the safest place to park. (Sanzone Dep. at 29.) On the subject of communication with disabled passengers, operators are taught to explain to the passenger every element of the boarding and deboarding process, including advising passengers to remain in their seats with their seatbelts on until the ramp is fully

---

[10] In his deposition, plaintiff's expert testified that he believed that the need to communicate with the disabled passenger regarding the boarding and deboarding process is implied in the text of 49 C.F.R. § 37.173. (Cleveland Dep. at 35.) While the Court gives substantial deference to an agency's interpretation of its own regulations, *see United States v. Cinemark USA, Inc*., 348 F.3d 569, 578 (6th Cir. 2003), the Court is not bound by a party's expert's opinion regarding such regulations. And, in any event, plaintiff's expert's opinion on the subject is not germane to the Court's deliberate indifference analysis.

deployed before stepping onto it, where to stand on the ramp, and the need to hold onto the handrails. (Sanzone Dep. at 26–27, 29, 30–31.) Jones received training as to the ADA and the operation of the lift, among other topics. (Jones Dep. at 26–27, 54–55; Jones Dep. Exs. 5, 6.)

### 3. Deliberate Indifference

"In passing the ADA, Congress created a private right of action that enables disabled persons to bring discrimination suits to enforce their rights." *LeClair v. Mass. Bay Transp. Auth.*, 300 F. Supp. 3d 318, 325 (D. Mass. 2018). "But the ADA is not a wholesale substitute for common-law personal-injury torts. Individuals can recover money damages under the ADA only if they prove intentional discrimination by the defendant." *Id.* (citing *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 126 (1st Cir. 2003); *Duvall*, 260 F.3d at 1138). Proof of intentional discrimination is also necessary to recover compensatory damages under § 504 of the Rehabilitation Act. *See Center*, 227 F. Supp. 2d at 871 (collecting cases).

The parties agree that the applicable standard for proving intentional discrimination is one of "deliberate indifference." *See LeClair*, 300 F. Supp. 3d at 325 (collecting cases applying deliberate indifference standard for damages under the ADA); *Center*, 227 F. Supp. 2d at 871 (noting that intentional discrimination can be inferred from a defendant's deliberate indifference); *see also R.K. ex rel. J.K. v. Bd. of Educ. of Scott Cty.,* 637 F. App'x 922, 925 (6th Cir. 2016) (in action challenging access to educational benefits, court noted that "to obtain money damages under the ADA and the Rehabilitation Act, [plaintiff] must show that [defendant] acted with 'deliberate indifference' towards his federally-protected rights"). "A party acts with deliberate indifference if it disregards a 'known or obvious consequence' of its actions, namely that its actions will violate the plaintiff's federally-protected rights." *R.K.*, 637 F. App'x

at 925.

"Deliberate indifference" is an "exacting standard." *Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1134 (11th Cir. 2019) (quotation marks and citation omitted). In *City of Canton v. Harris*, 489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989), the Supreme Court discussed the standard in the context of failure to train claims associated with the training of law enforcement officers. There, the Court observed that:

> In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.
>
> ***
>
> To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983. In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city could have done to prevent the unfortunate incident. Thus, permitting cases against cities for their 'failure to train' employees to go forward under § 1983 on a lesser standard of fault would result in *de facto respondeat superior* liability on municipalities—a result we rejected in *Monell* [*v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 693-94, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).] It would also engage the federal courts in an endless exercise in second-guessing municipal employee-training programs. …

*Id*. at 390–92 (internal quotation marks and citations omitted).

Accordingly, "[e]vidence of a pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure

to train." *H.M. v. Bd. of Educ. of the Kings Local Sch. Dist.*, 117 F. Supp. 3d 992, 1009 (S.D. Ohio 2015) (quotations marks and citation omitted). "Without notice that training is deficient in a particular respect, the decision-makers cannot be found to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* (citing *Connick v. Thompson*, 563 U.S. 51, 61, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (2011)).

John Cleveland, plaintiff's transit civil rights expert, opined that Metro RTA's protocol "is consistent with the requirement in 49 CFR part 37, [§] 37.173 to provide assistance to passengers with disabilities and operate equipment safely." (Doc. No. 98-8 (Report of John Cleveland ["Cleveland Report"]) at 1853.) In his deposition, he elaborated that the protocol developed by Metro RTA for training its operators represents "the best practice and the best way to go in terms of ensuring the safety of the person with a disability." (Cleveland Dep. at 32.)

Nevertheless, plaintiff points to the fact that Jones failed to communicate with Morataya before and during the alighting process—including his failure to advise Morataya to stay in her seat while he tested the lift to make sure it unfolded fully—as well as the fact that Jones was distracted by the traffic and was unable to see Morataya when he began to lower the lift. (MSJ Opp'n at 1886.) She highlights Jones' deposition testimony wherein he stated that he was never trained (and/or did not remember being trained) that he should provide passengers with instructions on stepping onto the platform, that he was never instructed to tell them to hold onto the handrails, and he was never instructed to advise passengers when it was safe to step onto the lift platform. (Jones Dep. at 42, 44.) According to plaintiff, Jones' "failure to provide instruction and assistance to Ms. Morataya, his lack of attention at the time he was operating the lift and inability to observe either [her] or the lift all contributed to cause her injuries." (MSJ Opp'n at

15

1886; *see* Cleveland Report at 1854.) She concludes that "[t]here should be no question that Mr. Jones['] lack of training in the need to instruct and assist disabled passengers deboarding from a lift, as well his lack of knowledge regarding how to properly operate the lift made an injury to a disabled passenger who was at high risk of falls substantially likely to occur." (MSJ Opp'n at 1899.)

Jones received training on the use of the lift, as well as the requirements of the ADA. (Jones Dep. at 26, 38, 40–41.) Moreover, even though not required by the ADA, Jones also received refresher training on the use of the lift. (*Id*. at 26, 51, 54–55.) That one employee does not remember receiving instruction on the portion of Metro RTA's protocol that, though not specifically required by the ADA, instructs operators to communicate with passengers regarding the boarding and deboarding process, "will not alone suffice to fasten liability" on Metro RTA. *Harris*, 489 U.S. at 390. There is no evidence in the record that Metro RTA was on notice that Jones was deficient in either his knowledge of how to properly operate the lift, or in his understanding of the need to communicate with the passengers during the board and deboarding process. (Jones Dep. at 141 [noting that this was the first time he had been involved in an incident that resulted in the injury of a passenger]; Cleveland Dep. at 44 [noting no prior accidents involving Jones].) In light of the undisputed evidence that Metro RTA's training protocol is fully compliant with the ADA, plaintiff's singular instance of purported inadequate training falls short of demonstrating deliberate indifference. *See Stephens v. Shuttle Assocs., LLC*, 547 F. Supp. 2d 269, 278 (S.D.N.Y. 2008) (solitary incident in which operator failed to advise passenger to power off her wheelchair cannot establish that transit authority "failed to adopt policies or procedures to effectively train their employees how to deal with disabled

individuals"); *Midgett v. Tri-Cty. Metro. Transp. Dist. of Or.*, 254 F.3d 846, 850 (9th Cir. 2001) (evidence of only a few instances of operators not treating employees as they were trained, did not demonstrate deliberate indifference); *see also Wilson*, 2007 WL 2900389, at *9 (failure to institute "mystery rider" program, an internal program not required by the ADA to spot check bus drivers for proficiency, did not establish deliberate indifference).

But plaintiff argues that Metro RTA was on notice that its training program was deficient because there had been a prior accident involving a disabled passenger who was in a wheelchair and was being helped by a non-Metro RTA employee of an adult day care onto the ramp when he fell backwards as the ramp was being lowered. (Opp'n at 1894–95; *see* Sanzone Dep. at 38–40.) This factually dissimilar incident, which did not call into question the instructions (or lack thereof) from a Metro RTA operator, would not have put Metro RTA on notice that its training protocol was not being effectively communicated to its employees. Moreover, the fact that the incident was used as a teaching tool in subsequent training sessions further demonstrates Metro RTA's good faith response to its obligation to train its employees to proficiency. (*See* Sanzone Dep. at 41.)

In the absence of evidence that, if believed, would establish Metro RTA's training efforts rose to the level of deliberate indifference, plaintiff's failure to train claim must be dismissed.

### B.  Failure to Maintain and/or Report and Remove Lift

Count II also alleges that Metro RTA discriminated against Morataya, in violation of the ADA, by failing to maintain or repair the Braun lift, or, in the alterative, by failing to remove the SCAT from service due to a faulty lift. (*See* Am. Compl. ¶ 15.) Title 49 C.F.R. § 37.163, titled "Keeping vehicle lifts in operative condition[,]" requires public transit providers to institute a

system of regular and frequent maintenance checks of the lift and ensure that vehicle operators report lift failures as quickly as possible, and to take inoperable lifts out of service until they are repaired. *See Tandy v. City of Wichita*, 208 F. Supp. 2d 1214, 1224 (D. Kan. 2002) (citing 49 C.F.R. § 37.163). In particular, § 37.163(d) provides:

> [W]hen a lift is discovered to be inoperative, the entity shall take the vehicle out of service before the beginning of the vehicle's next service day and ensure that the lift is repaired before the vehicle returns to service.

Referencing the "glitch" that sometimes caused the Braun lift to not fully extend—and the operator to push the control button again—plaintiff alleges that Jones' failure to report the glitch as a mechanical defect constitutes a violation of the ADA.[11] The problem with plaintiff's argument is that there was no defect in the lift. What Jones referred to as a "glitch," and plaintiff's own expert merely called a "common characteristic" of the Braun lift, was not a defect that required maintenance. (Cleveland Dep. at 37.) Instead, the evidence consistently demonstrated that this was a feature of the lift that an operator needed to be aware of when using it, and this feature was covered in training. (*See* Sanzone Dep. at 49–50; Jones Dep. at 104;

---

[11] Plaintiff also points to a second purported "mechanical default" in the lift, relying on the voluntary statement contained in a police report prepared following the accident wherein Jones stated that there was a "mechanical default" and that the "lift did not perform properly." (Opp'n MSJ at 1889; Doc. No. 98-2 at 1614–18.) "A party seeking or opposing summary judgment may rely on deposition transcripts, electronically stored documents, affidavits, declarations, and other materials." *Beans v. City of Massillon*, No. 5:15-cv-1475, 2016 WL 7492503, at *6 (N.D. Ohio Dec. 30, 2016) (citing Fed. R. Civ. P. 56(c)(1)(A)). There is no indication from the police report that Jones was ever sworn in, as a witness is before a deposition, or that he was given an opportunity to review the report and correct any errors. Moreover, when asked about the report at his deposition, Jones explained that he was simply upset in the moment that the ramp did not go down as quickly as he would have liked, but he was mistaken when he stated that the lift was defective. (Jones Dep. at 128 ["And I – while I was upset, I kind of assumed that it wouldn't go back down. But, really I was just upset, and I was just adding things in my mind too quickly. *So I don't believe there was actually a mechanical default at that time.*"], emphasis added.) Because Jones did not adopt his unsworn statement, it does not serve as competent evidence to be considered on summary judgment. *See Pollino v. City of Phila.*, No. 03-6288, 2005 WL 372105, at *7 (E.D. Pa. Feb. 15, 2005) ("The unsworn statements alleged to be incorporated by reference in the interrogatory answer are clearly nothing more than hearsay that would not be admitted at trial for substantive purposes" and "is not considered when reviewing a motion for summary judgment.") (citing *Adickes*, 398 U.S. 159 & 159 n.19.)

Cleveland Dep. at 37–38.) Second, the glitch did not render the lift inoperable and Jones was able to deploy the lift without the glitch even occurring. (Jones Dep. at 104; Cleveland Dep. at 21 ["There was no defect in the lift."].) Because Morataya's accident was not the result of a failure to report or remove from service an inoperable lift, the "glitch" cannot serve as a basis for liability under the ADA.

Because plaintiff has not demonstrated the existence of a genuine issue of material fact as to whether Morataya was intentionally discriminated against under the ADA, plaintiff's ADA claim must be dismissed. For all the same reasons, plaintiff cannot maintain her Rehabilitation Act claim in Count III. Plaintiff has not demonstrated that Metro RTA was deliberately indifferent in its training of its employees, and there is no evidence that it failed to remove an inoperable lift from service prior to Morataya's accident. Further, plaintiff has not otherwise demonstrated that Morataya was denied the benefits of, or excluded from the participation in, Metro RTA's public transportation services solely by reason of Morataya's disability. Accordingly, plaintiff's federal claims are dismissed.

### C.    Supplemental Jurisdiction

The Court, having dismissed all claims over which it had original jurisdiction, declines to exercise supplemental jurisdiction over the state law claims. 28 U.S.C. § 1367(c)(3) (providing that a court "may decline to exercise supplemental jurisdiction[,]" if it has "dismissed all claims over which it has original jurisdiction"). In the Sixth Circuit, there is "a strong presumption against the exercise of supplemental jurisdiction once federal claims have been dismissed"; the Court should retain jurisdiction "only in cases where the interests of judicial economy and the avoidance of multiplicity of litigation outweigh [the] concern over needlessly deciding state law

issues." *Packard v. Farmers Ins. Co. of Columbus*, 423 F. App'x 580, 584 (6th Cir. 2011) (quoting *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006)); *see Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims"). The discretion to decline supplemental jurisdiction over state-law claims extends to all stages of litigation, including summary judgment. *See Booker v. City of Beachwood*, 451 F. App'x 521, 523 (6th Cir. 2011) (citing *Nails v. Riggs*, 195 F. App'x 303, 313 (6th Cir. 2006)).

The remaining claims all implicate important state law issues—including an evidentiary issue regarding the interpretation and application of Ohio Rev. Code § 313.19 (cause of death)—that, in the absence of federal jurisdiction, are best addressed in the first instance by the state courts.[12] *See James v. Hampton*, 592 F. App'x 449, 462 (6th Cir. 2015) (noting that courts may decline supplemental jurisdiction over claims that raise a "novel or complex issue of State law") (quoting 28 U.S.C. § 1367(c)(1)). Having weighed the relevant factors, the Court finds that it is appropriate to remand the remaining claims for disposition in state court.

## IV. CONCLUSION

For the foregoing reasons, the motion of defendants Metro RTA and Corey Jones for summary judgment is GRANTED IN PART. Plaintiff's claims under the ADA and the

---

[12] For the same reasons, the Court declines to reach the question of whether Jones is entitled to statutory immunity under Ohio Rev. Code § 2744.03.

Rehabilitation Act are DISMISSED, and the remaining state law claims are REMANDED to the Summit County Court of Common Pleas.

**IT IS SO ORDERED.**

Dated: July 28, 2020

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**